# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS SKÖLD**<br><br>             **Plaintiff,**<br><br>   v.<br><br>**SONOMA PHARMACEUTICALS, INC.**<br><br>             **Defendant.** | **CIVIL ACTION NO. 21-1026** |

### MEMORANDUM OPINION

**Rufe, J.**                                                                                                               **September 27, 2022**

Plaintiff Thomas Sköld developed and patented skin care products called Ceramax and granted Defendant Sonoma Pharmaceuticals, Inc. an exclusive license to manufacture, promote, and sell the products. Plaintiff moves for summary judgment on his claim and Sonoma's counterclaim for breach of contract and seeks partial damages in the amount of $470,000. Plaintiff also seeks an order directing Sonoma to provide an accounting, and to transfer to Plaintiff the Ceramax trademark and registrations, all regulatory filings and approvals, all records, and all clinical studies concerning Ceramax.

## I.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[2] When "the evidence is such that a

---

[1] Fed. R. Civ. P. 56(a).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

reasonable jury could return a verdict for the nonmoving party," there is a "genuine" dispute over material facts.[3] To evaluate a motion for summary judgment, it is necessary to "view the facts in the light most favorable to the non-moving party" and draw "all reasonable inferences in that party's favor."[4] It is improper for a court "to weigh the evidence or make credibility determinations" as "these tasks are left to the fact-finder."[5] The non-moving party must support its opposition to the motion by pointing to evidence in the record.[6] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[7]

## II. FACTS[8]

In 2004, Plaintiff Thomas Sköld developed and patented "Lipogrid technology" that he used to develop topical skin-care products under the name "Ceramax."[9] In 2014, Sköld and Defendant Sonoma entered into an agreement pursuant to a term sheet for Sonoma to manufacture and sell Ceramax products.[10] Sonoma began selling Ceramax products in 2016, which were manufactured by APL Pharma (Sweden).[11] In 2018, the parties entered into a "Technology In-License Agreement" between Sonoma (the "Licensee") and Sköld (the "Licensor"), which provided for a license maintenance fee of $10,000 per month, offset by royalties on the products, through the end of the patent period in 2024.[12] Under the Agreement,

---

[3] *Id.*

[4] *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[5] *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d 1998) (citation omitted).

[6] *Celotex Corp v. Catrett*, 477 U.S. 317, 322–23 (1986).

[7] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[8] Except where otherwise noted, the relevant facts are not disputed.

[9] Sköld Decl. ¶ 3 [Doc. No. 20-3].

[10] Sköld Decl. ¶ 4 [Doc. No. 20-3].

[11] Sköld Decl. ¶¶ 8, 10 [Doc. No. 20-3].

[12] Agreement §§ 8.1, 14.1, 14.2, 14.3 [Doc. No. 1-3].

Sköld agreed to provide "reasonable support in the form of consulting services" in connection with regulatory approval,[13] make himself "reasonably available" to assist Sonoma in all matters concerning the manufacture and commercialization of Ceramax products,[14] and offer "reasonable support in the form of consulting services directed towards any change or addition to Product Manufacturing capabilities."[15] Sonoma agreed to "use commercially reasonable efforts" to commercialize the products.[16] Both parties agreed to meet at least twice a year,[17] with Sonoma

---

[13] *See* Agreement § 3.3, providing that: "Support by Licensor. At Licensee's request, Licensor shall provide Licensee with reasonable support in the form of consulting services directed toward securing and maintaining Regulatory Approval."

[14] *See* Agreement § 5.1, providing that:

> Availability of Licensor. Licensor shall make himself reasonably available to Licensee to assist Licensee in all matters concerning the Manufacture and Commercialization of the Licensed Products and in preparing and processing Approval Applications. Licensee shall pay Licensor's reasonable travel expenses (not to exceed $15,000 in the twelve (12) month period following the Execution Date) incurred by Licensor if needed for manufacturing services and product development reasons which are requested by Licensee and approved by Licensee's CFO or Licensee's Intraderm Division President in writing in advance. Licensor must present to Licensee within thirty (3) days after the end of the month in which travel occurred receipts for travel expenses actually incurred by Licensor.

[15] *See* Agreement § 6.1, providing that:

> [Manufacture of Device Application approval and Commercial Supply.] At any time during the term of this Agreement, Licensee may elect to Manufacture or have Manufactured Licensed Products at one or more facilities located inside or outside of the Territory. Licensor acknowledges that Licensed Products are currently being manufactured and supplied by APL Pharma (Sweden), and the Parties plan to commence manufacturing for two additional Products (ointment and lotion formulations). Licensor shall, without additional consideration, provide Licensee or its designated contract manufacturer with reasonable support in the form of consulting services directed towards any change or addition to Product Manufacturing capabilities to provide the supply of Licensed Products to Licensee. Licensee shall record any changes or additions to Licensee's Manufacturing site on the relevant Product Addendum.

[16] *See* Agreement § 4.3, providing that:

> Commercialization Efforts. Licensee agrees to use commercially reasonable efforts to Commercialize Licensed Products in the Field in the Territory in which Regulatory Approvals have been obtained and adequate and qualified sales team is in place. Without limiting the generality of the foregoing, Licensee shall determine the pricing for the Licensed Product at its sole discretion.

[17] *See* Agreement § 5.2, providing that:

> Periodic Meetings. Representatives of the Parties will meet (in person at least twice a year and telephonically, or via videoconference) periodically. Each Party shall bear its own costs for participation in such meetings unless approved by Licensee's CFO or Licensee's Intraderm Division President in writing in advance. The Parties shall: (a) discuss and supervise the Manufacture and Commerciality of Licensed Products, including introduction of new Licensed

providing reports of these meetings.[18] The Agreement provided that in the event of a material breach, the non-breaching party was required to give a notice of default with an opportunity to cure in 90 days.[19] The Agreement further specified the results of termination.[20]

Sköld contends that he upheld his end of the bargain, and that Sonoma did not argue differently until after Sköld gave formal notice of his claim of Sonoma's breach.[21] According to

---

Products for Commercialization in the Field in the Territory[;] (b) the progress and conduct of Commercialization, meeting Commercialization goals and dealing with obstacles to successful Commercialization; (c) discuss and supervise actions planned by Licensee tin respect of Licensed Products where such actions could reasonably be expected to have a material impact on the Licensed Products in the Territory or outside the Territory; and (d) discuss in good faith other issues relating to the Manufacture and Commercialization of the Licensed Products in the Territory and outside the Territory. All such discussion and other activities shall be subject to Article X of this Agreement.

[18] *See* Agreement § 5.3, providing that: "Reports Licensee shall provide to Licensor an annual report detailing and evaluating all issues relating to Sections 5.2 (a) to (d) above."

[19] *See* Agreement § 14.2, providing that:

Termination. (a) Failure of Licensee or Licensor to comply with any of their respective material obligations contained in this Agreement which constitutes a material breach shall entitle the other Party (the "**Non-Breaching Party**") to give such Party (the "**Breaching Party**") a default notice requiring it to cure such default. If such default is not cured within ninety (90) days after receipt of such notice, the Non-Breaching Party shall be entitled (without prejudice to any of its other rights conferred on it by this Agreement) to terminate this Agreement. Notwithstanding the foregoing, in the event of a non-monetary default, if the default is not reasonably capable of being cured within the ninety (90)-day cure period by the Defaulting Party and such Defaulting Party is making a good faith effort to cure such default, the Non-Breaching Party may not terminate this Agreement; provided however, that the Non-Breaching Party may terminate this Agreement if such default is not cured within one hundred eighty (180) days of such original notice of default. The right of either Party to terminate this Agreement as herein above provided shall not be affected in any way by its waiver of, or failure to take action with respect to any previous default.

[20] *See* Agreement § 14.4, providing that:

Consequences of Expiration or Termination. Upon expiration or termination of this Agreement:

(a) for any reason, all licenses granted by each Party to the other Party shall terminate, and each Party shall cease any use of the other Party's Trademarks;

(b) Subject to contractual obligations under any manufacturing agreement to which Licensee is a party, Licensee shall cease Manufacturing activities;

(c) Licensee shall have the right to sell-off its existing inventory of Licensed Products and shall promptly cease all Commercialization of Licensed Products thereafter; and

(d) other than for termination by Licensee for Licensor breach, Licensee shall transfer to Licensor ownership of all regulatory filings, including, without limitation, the Regulatory Approval, correspondence, records, and clinical studies and reports pertaining to the Licensed Product.

[21] Sköld Decl. ¶ 22 [Doc. No. 20-3].

Plaintiff, Sonoma decided to stop promoting and selling Ceramax products in 2020, without consultation with Plaintiff.[22] Plaintiff contends that this was part of Sonoma's strategy to sell only products that it owned, rather than licensed products.[23] Sonoma made the last monthly fee payment of $10,000 for April 2020.[24] Sonoma argues that it stopped promoting the products because it could not obtain a timely or satisfactory supply from APL, the company manufacturing and supplying Ceramax.[25]

### III.   DISCUSSION

Under Pennsylvania law, which governs this dispute,[26] a cause of action for breach of contract requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[27] "Issues of contractual interpretation are questions of law."[28] Contracts are to be interpreted according to the parties' intent, and where "a written contract is clear and unambiguous, the parties' intent is contained in the writing itself."[29] "Unless otherwise specified, a contract's language shall be given its plain and ordinary meaning."[30]

There is no dispute that Sonoma stopped making the monthly payments required under the Agreement after April 2020. There is no dispute that Sonoma did not give Sköld notice of

---

[22] Sköld Decl. ¶ 25.

[23] Sköld Decl. ¶ 28.

[24] Sköld Decl. ¶ 31.

[25] Def.'s Opp. at 8-9 [Doc. No. 26].

[26] Agreement § 15.9.

[27] *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (internal quotation marks and brackets omitted).

[28] *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015).

[29] *Id.* (citing *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

[30] *Wert* 124 A.3d at 1259 (citing *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012)).

any default and an opportunity to cure. Instead, the evidence shows that on October 12, 2020, Sköld's counsel notified Sonoma that it was in breach of the Agreement.[31] A later letter from Sköld's counsel acknowledged that in a telephone conversation, Trombly of Sonoma stated that Sonoma wanted to terminate the Agreement.[32] Sonoma provided written notice of breach by Sköld in February 2021, stating that Sköld should have alerted Sonoma to the fact that APL would be unable to accommodate Sonoma and that "he did not cooperate in providing a reasonable manufacturing alternative per Sections 5.1 and 6.1 of the Technology Agreement."[33] This letter came more than six months after Sonoma had decided to stop marketing Ceramax.

There are some disputed facts. Sonoma contends that it had no choice but to stop promoting Ceramax because of substantial problems with the production of Ceramax by APL, leading to the termination of that relationship in June 2020.[34] Sonoma also contends that the product was overpriced and left an unpleasant residue according to consumers, who often stopped filling their prescriptions.[35] According to Sonoma, Sköld gave no assistance in resolving these problems, and a reasonable jury could infer that because Sköld would have benefitted from the successful sale of Ceramax products, he must not have been able to help.[36] Sonoma argues that this inference serves as a basis to excuse any requirement of formal written notice and

---

[31] Def. Ex. 7. [Doc. No. 26]

[32] Def. Ex. 9 [Doc. No. 26]

[33] Def. Ex. 10 [Doc. No. 26]

[34] Def. Ex. 5 [Doc. No. 26].

[35] Def.'s Opp. at 13 [Doc. No. 26].

[36] Def.'s Opp. at 21 [Doc. No. 26].

opportunity to cure as it would have been futile.[37] In the alternative, Sonoma argues that Ms. Trombly's February 19, 2021 letter constituted such notice.[38]

The problem with Sonoma's argument is that Sonoma did not comply with the Agreement, which provides that all notices under the Agreement must be in writing, and that notice of default include an opportunity to cure.[39] Courts have held that "strict compliance with a notice provision was futile only where the [party] substantially complied with the contractual notice provisions by giving some form of actual notice to the [other party], [the other party was] given an opportunity to remedy the dispute, and yet the [other party] made it clear they would not do so."[40] That did not happen here. Although "[a] party who cannot perform its own obligations under a contract is not entitled to collect damages,"[41] Sonoma relinquished this defense when it failed to provide the written notice of the breach and an opportunity to cure as required by the Agreement. The Court will grant Plaintiff's Motion. An order will be entered.

---

[37] Def.'s Opp. at 21 [Doc. No. 26].

[38] Def.'s Opp. at 22 [Doc. No. 26].

[39] *See* Agreement § 15.5, providing that "Notices. All notices hereunder shall be in writing, effective upon receipt, and shall be delivered personally, mailed by registered or certified mail (return receipt requested, postage prepaid), or sent by express courier service, to the other Party at [the addresses set forth in the Agreement]."

[40] *Borough of Lansdale, Pa. v. PP&L, Inc.*, No. 2006 WL 859431 at *5 (E.D. Pa. Mar. 31, 2006) (citations and emphasis omitted).

[41] *Empire Properties, Inc. v. Equireal, Inc.*, 674 A.2d 297, 305 (Pa. Super. Ct. 1996) (citations omitted).